Good morning, your honors. May it please the court. Michael Proe, appearing on behalf of Appellant, City of Beaumont. I'd like to reserve three minutes for rebuttal. The JPX Jet Protector is a defective product, and it's so fundamentally flawed that it fails the product liability standards under multiple theories. And these have been addressed in the briefing, but to emphasize several of the points on the manufacturing defect. It's a rather simple standard, that is, does the product as manufactured deviate from the intended result that the manufacturer has? I ask a procedural jurisdictional question. Is Bacalany involved in this appeal? It's an interesting question, your honor. The judgment was ending the case, and I went back to look as I was preparing and saw the moving party on the motion was just Piexon. And so the answer is, I don't believe Mr. Bacalany has filed any papers or a statement of appearance. He was a third-party defendant in the underlying case, and as I understand, is representing himself. So he's not part of this appeal? Well, the judgment was entered dismissing our entire third-party cross-complaint, so when we appealed, we did serve our notice of appeal on both of the third-party defendants that had been active in the case, Piexon and Mr. Bacalany. So as far as you know, he's out of the case now. It's final as to him? Well, we appealed from the entry of the judgment, so to the extent to which the judgment would get him out of the case, we have appealed from it, and therefore we served our notice of appeal on him. I wouldn't say he's out of the case. I would say he's a party to the appeal, but to some extent he's along for the ride in that he got the benefit of the district judge's summary judgment ruling dismissing our entire third party. There may not be a final judgment then as far as even having an appeal. It's not final to all parties. The answer is you don't know the circumstance. We can't find it out from the docket. I wouldn't say I don't know the circumstances. I would say that the functional, practical reality here is the district judge entered judgment ending our case. The judgment says it's as to the claims against Piexon. It doesn't say anything about Bacalany. Well, Your Honor, all I can say is it's the practical function of what happened as a judgment was entered that ended our third party costs. We'll have to pursue that. Excuse me? We'll have to pursue that as a judge. And, Your Honor, I'd be happy to, and honestly, because the question, you know, I thought this morning I was looking at the judgment and I thought about the question you just raised, but it's not something that's been focused or you'd bring it up again. It's something that's been briefed, argued, and so I would appreciate a chance. I appreciate what Your Honor is raising, appellate jurisdiction. You want to know as a threshold question. So I think we should certainly go ahead with the argument as you anticipated it. I'll give you a little extra time because this was something that you didn't see coming. But I certainly think after argument both sides should file something with the court. It can be in a 28-J fashion explaining, trying to answer Judge Fischer's question. No, but fair enough, and I appreciate that. And as I said, the appellate papers have certainly been served on Mr. Bacalany. I don't know if he's present today, but I know he contacted our office to ask about this hearing date and so on. So I know the case has been going forward in all purposes, treating him as a party, and he's had the opportunity to file a repair. I know the practical reality is nothing's going on in the district court. The district court case is over. So, you know, as I say, there's ongoing proceedings against some party down there. It just wouldn't reflect reality. That's whether that requires some administrative or non-pro-tunk amendment of the judgment or whatever it would require. The reality is there's no case going forward in the district court against anyone. This is it. The whole case is right here right now. So going back to the ruling, the motion that was brought and the judgment. So we addressed manufacturing defect, of course. And I think here with the evidence being in Pixon's own papers and their own document materials, they intend an exit velocity, a muzzle exit velocity of 180 meters per second, which is about 590 feet per second. And that, in fact, in testing this product, our ballistics expert found virtually all tested products greatly exceeded that muzzle velocity, many by a factor of one and a half or approaching two times that speed, which would result in substantially more kinetic impact than if it were at the published velocity. What difference would it have made? I think Judge Pragerson said causation was the problem here. So if you fired from one foot away from the injured party, whether the velocity is 520 or 890, what difference does it make causation that is in the record? And I think that's where, first of all, there is evidence and there's also a reasonable inference that the material hitting the victim with more velocity as opposed to less velocity does more damage. And I think to some extent to say it is almost to state the obvious because you all know from childhood that if something hits you going slow and if something hits you going fast, it does a lot more damage going fast. We've used the example of a baseball in our brief, a car, someone punching you. Velocity per se creates more kinetic impact, more damage, more injury. So to make an inference that there's no difference I think is the unreasonable inference. To say there's no difference between something hitting you at 590 feet a second and something hitting you at 1,000 feet a second, that's the unreasonable inference because as a matter of physics and common experience and common sense, something hitting you faster does do more damage, does do a lot more damage. We're talking almost three times here. Yes, but counsel, this is not a baseball. It's a spray. Sure. And the aerosol becomes an aerosol the farther away you get. So the kinetic energy or impact is a function of distance. And I come back to Judge Malloy's question. This was fired from, what, one feet, two feet? And he knew it was not supposed to be used at that distance. So what's the testimony or the evidence that it would have been a different injury if it had been 590 feet per second as opposed to 980? Right. I don't think your expert, Wyatt, was able to. Is that your expert? Well, and it might be that. Isn't Wyatt getting it right? He's your expert? Wyatt, correct. Yeah. And he said he didn't know if it would be the same injury. If it had been fired, right. So if it had been fired at the stated velocity, would it have done the same damage? He said that because all of the cartridges he tested essentially didn't perform at the stated velocity, he couldn't say. He was only able to test the cartridges he was able to find. And if the product is so defectively manufactured that it never comes off the assembly line at the stated velocity, it would seem a curious result to reward the manufacturer and say, you win because he couldn't find a single one of your products that tested at the velocity. So it's, I understand. Counsel, maybe I'm misunderstanding the record. My understanding was some traveled between 800 and 900, most of them. Some as low as 550. Some as high as 1,000. So there was a variable. But to say none, and nobody tested Clark's FPX, right, or JPX. And I believe his testimony, and to be fair enough, he said nearly all. He said nearly all of the ones I tested came in substantially above the tested velocity. This to some extent turns on the foreseeability of misuse question, which is an issue of fact as well, and defense on which the cross defendant has the burden. If there is foreseeable misuse of this product, that it will be used at close range, then, I mean, your Honor mentioned is there an aerosol dispersal. I think in traditional pepper spray, yes, you expect an aerosol dispersal. This is a gel being propelled out the narrow bore of a gun at extremely high velocity, and at one to two feet at the range that Mr. Wyant was looking at, he agreed actually with Pixon's prior expert, Canubal, I almost pronounced the name, that essentially at those distances, a gel or liquid being propelled at high velocity performs like a projectile, like a solid projectile. And that's absolutely his expert testimony, and it comports with Pixon's expert's testimony. And it makes sense. So at one to two feet still, even at five feet, the gel is nothing like an aerosol spray. This is a gel getting shot out at hundreds of miles an hour from a gun, and it's got a lot of weight behind it other than just the pepper. And that's a different product. But certainly at the one to two feet range where if that's a foreseeable misuse, which we think is at least an issue of fact for the jury here, given both police officers who gave declarations and depositions in this case said that that was to be anticipated, that it would be expected once it was put in use. It could be used. You're drawing it presumably on someone that you're in close quarters with, you're arresting. At one to two feet, it behaves as a solid projectile. There was testimony it could blow off a fingertip or it could destroy bone. It could certainly blow apart an eyeball, and that's what happened here. And therefore, for those reasons, if the misuse is foreseeable, it is an inherently dangerous product. And you look at the design test. We talked about consumer expectations test under a case called McCabe. Does this document violate its own product literature about safety standards? Its own product literature said you can safely aim at the face. There is no kinetic impact, no kinetic impact. That's what the police officers are being told when they're trained on this product, no kinetic impact. And that is false. That is simply false. And it has a lot of kinetic impact, even at any distance, as a gel is hitting you propelled at hundreds of miles an hour. Certainly at one to two feet, it is having a devastating kinetic impact. And to have a flat misrepresentation affecting product safety under the case law we've cited, McCabe says. You're saying that that goes back to what, the design or manufacturing defect? It didn't make any difference to Clark because he fired it in overcoming the warnings about not doing it within five feet. There were warnings not to do it within five feet. What they're not was a warning that this isn't like the pepper spray you know. Essentially, if you fire this at close range, it has such a powerful kinetic impact it can destroy an eyeball. It will blind the person. Don't do it. At five feet? If foreseeably misused within the warned range. I agree. So now you're saying it has to be misused. I'm saying foreseeable misuse is something that a manufacturer has to account for, both in their design of the product and the risk benefit test and in the failure to warn. Foreseeable misuse is absolutely something a manufacturer has to account for. And that's a foreseeable misuse, which is an issue of fact. It's also an affirmative defense, meaning the evidence in the record has to only allow for the conclusion argued by the defendant. It's an affirmative defense on which they're moving for summary judgment, foreseeable misuse. And I'm not sure this is in the record or not, but I'm going to ask it anyway. Did the city of Beaumont immediately halt the use of this product after this incident? You're correct that it's not in the record, and the answer is yes. They were immediately taken and put in a safe. And as far as I know, that's never been countermanded. So, yes, they were horrified to see that this could blow apart someone's eyeballs. And, again, we're not just talking about the eye that's on the temple that got shot into. The opposite eye socket, too. And, again, you're saying what difference does it make if it hits at 590 feet per second or 1,000 feet per second? Well, it's a reasonable inference. It does more damage at 1,000 feet per second. It's not a reasonable inference that it's no harm, no foul. And for the district judge to indulge the inference, the unreasonable inference, in favor of the moving party and say, well, you didn't disprove that it makes no difference. Basic physics, really. I mean, and you can say there's a difference between solid and a liquid, but it doesn't matter. A solid or a liquid is hitting you. If it hits you faster, it's doing more damage. So to say we're going to give the moving party the inference that it makes no difference, there's no evidence that it made no difference. Where's the burden there? You've got an unreasonable inference being given to the moving party as opposed to saying there's a reasonable inference that it would do more damage. That said, Mr. Wyant certainly testified as well because we addressed the risk-benefit issue. Was the foreseeable misuse theory advancing here, advanced in the district court? Absolutely. Yes, it was. It was squarely addressed, and I believe even in the ruling, as to whether it forced the ability of misuse. But, again, as a defense, that burdens on defendant to prove it with their moving papers anyway. Just as it was with sophisticated intermediary and with the second part of the risk-benefit analysis, which I haven't gotten to. But the risk-benefit analysis says even if this was manufactured as designed and so on, if there is basically an excessive preventable danger in the product, that is, all we need to show is that the design caused the injuries, not the defect, the design. The design of this product is to propel a gel at incredibly high speeds at someone's face. The targeting slide in their training says aim for the nose. You're supposed to aim for the nose. But if you hit an eye, by the way, you can blow it apart and blind them. If that argument is correct, why isn't a Glock 21 banned under the same theory? It's a firearm, shoots a bullet. It's intended to do what it does. Your theory is, well, this is a dangerous article. So is a Glock 21. And then you get into the risk-benefit analysis. And the Glock, the Chavez versus Glock case, of course, does exactly that. And it may well be, if the defendant shows, that for its purpose and for its needs, it would not be practical or reasonable to modify this and create an alternative design. That's the risk-benefit analysis, which here, by the way, the defendant did not introduce any evidence at all on the risk-benefit analysis. All right, counsel, I'm going to ask you to—we're way over time, but I'm going to give you two minutes for rebuttal. Okay. Fair enough. I was just about to answer his question, though, which is this is a less lethal device. The Glock is meant to kill. If it fires too fast, this is not meant to kill. This is less lethal. Less lethal. He pulls it when he doesn't want to kill or maim her, right? So for that product to be doing two or three times the intended damage is a very different animal. This isn't meant to kill or maim. Thank you. We have two minutes in rebuttal. Good morning. Christopher Anzulli on behalf of PXI AG. Pleasure to be here today. Thanks for having me. There was no justifiable reason the court should have used that product that day. Nothing. The best evidence on that is the video, and I know that's part of the record. Right after the suit was commenced, the city of Beaumont settled with Ms. Hernandez for $18.5 million like they should have. Officer Clark was wrong. There was no excuse. Nonetheless, the city of Beaumont is bringing a third-party action here. Now, PXI wasn't sued by Mrs. Hernandez. None of these claims were brought by Mrs. Hernandez. These were all brought by the city of Beaumont. The city of Beaumont is now trying to deflect its negligence onto the product. And as Judge Pregerson saw in the trial court, they did not sustain their burden. They didn't do that. Burdens didn't shift to PXI. They had a full and fair opportunity to present their case to the trial court. Tons of depositions, a lot of paper discovery, a lot was done down there. Judge Pregerson reviewed the whole record and said they didn't do it. They didn't sustain their burden. So what did we see in the lower court? We saw legions of warnings about this product that came from PXI. They came in law enforcement users' manuals, law enforcement users' PowerPoints, law enforcement instructor manuals, law enforcement instructor PowerPoints, the instruction and safety manuals that came with the product, as well as warnings directly on the product. It was clear. You have a minimum safety distance of five feet. Discharging at the eyes, at the face, closer than five feet can cause serious and permanent injuries, significant injuries, and everyone deposed in this case understood that. There's no witness that came in and said, oh, my, I didn't know that that couldn't cause blindness if fired at close range. Now, we're not talking about five feet here, Your Honors. The video is clear. We're talking more like six inches. There were no exigent circumstances here. He had Ms. Hernandez on the front of the car. He had her hands behind her back. He was holding her hands, had his cuffs on one hand, and he took out that product, turned it around, pointed at her face, and pulled the trigger. He was warned not to do that. There's been no evidence that he wasn't warned. Now, PXI put together the warning materials, and they gave it to IBS Sigma, who was the distributor in this case, and their agent, Mr. Bacalini. Mr. Bacalini was trained by PXI to be a master instructor. Any notion that PXI didn't rely upon Mr. Bacalini to put forth these warnings is not in the record. That's why the sophisticated user defense certainly fits in here. They're not saying, on the other side, that Bacalini or City of Beaumont are not sophisticated users. They're just saying, well, we didn't show in the trial court that PXI relied upon that. Well, they trained Mr. Bacalini and gave him all the information, and all of the information says PXI all over it. So this was presented to the trial court, and PXI showed that there was absence of any evidence to support Beaumont's case. Now, counsel, maybe this is the time to address counsel's foreseeable misuse argument then. He said that was argued and presented to the district court. The district court looked primarily at three causes of action. Failure to warrant, they looked at design defect, both product defect, manufacturing defect, and design defect. And they said that Beaumont did not prove their first case. They didn't sustain their burden to show evidence of, as Judge Molloy says, there was no evidence of causation on any of them. As far as the warnings, no evidence that if the warnings were different, Officer Clark would have done something differently. Every person, every witness that testified said they understood those warnings and what they meant. Two, as far as the negligent manufacturing, number one, Wyatt got it all wrong. He doesn't even know how to measure this type of a product. And what's interesting about the case and about Wyatt is that Your Honor talked about a Glock 21, 45 caliber pistol. Well, that's what they're likening this product to. If this is like a Glock 21, then how come expert Wyatt wasn't able to rupture an eye when he went past 12 inches in all of his testing? He wasn't able to do that. All he was able to say is, this could rupture an eye within 12 inches. He didn't talk about anything past that. He didn't go to the five-foot mark here. Foreseeable misuse, there were two people deposed on that. And they say, well, under exigent circumstances, you may violate a rule. You may cross over that five-foot mark. That's not what Officer Clark did. Officer Clark had Ms. Hernandez by her hand, took the product out of his holster, pointed it right at her face and pulled the trigger from probably six inches away. That's not foreseeable misuse. But we didn't even get there because Judge Cregason found, after looking through all the record, that they didn't prove their case. They had holes in it. And they couldn't prove it with the evidence on the record. So there was no failure to warn. Nobody was confused. Nobody came up here and said, these warnings are insufficient. Matter of fact, the city of Beaumont in the case retained two, not one, two warnings experts. It's nowhere before this court, and it was nowhere before the trial court. They didn't use them as support for deficient warnings. The kinetic impact theory is a new one, and it was presented to the court for the first time here. The JPX is not a kinetic impact weapon. That's like a bean bag or a baton. When used appropriately, is there some force? Of course there is. But it's negligible. They point to one slide in one PowerPoint and somehow extrapolate from that, that somehow the Exxon didn't warn appropriately when every single witness testified said they understood the warnings. As far as the product defect case below, I still don't know what it is. If it's the fact that Mr. Wyatt did some testing and saw that some of the velocities, which he's using completely different physics here, some of the velocities were higher than were put on some marketing materials, I agree with Judge Malloy, and as we raised here, there's no proximate cause. It was six inches away from her face. But is that really the issue? The issue is that he was warned not to fire this thing within five feet. So he was told not to fire it within five feet. We're going to try to make a case on product defect when we're talking about six or seven inches away, and whether it was 180 meters per second or something more. As Judge Preggison found, there was no medical evidence. There was no scientific evidence. This is not an inference. There's no inference there. You've got to provide the court with some kind of testimony, some kind of evidence, and there was none. Nonetheless, you still shouldn't be firing this within five feet. So if Wyant was true and he was correct in his testing, well, then Piaxon put in a four-foot safety room. If he was only able to rupture the eye within one foot, well, they had four extra feet there that he could have used. On the consumer expectation test, Your Honor, Judge Preggison found, and I think the record supports, that the general public certainly doesn't have enough experience for consumers to form minimal safety assumptions with this product. Even Beaumont required that their officers do five hours of training before they were able to use this. In discussing this product, you need to talk about flux density, joules, kinetic energy, fog tips, streams, fluid properties. I submit those are even properties that Plaintiff's expert didn't understand. He just looked at velocity, said this was a bullet, traveled like a bullet, and that's what caused the incident. So I'm going to follow up on a question that Judge Owens asked, and this may be not, it probably isn't in the record, but counsel responded to Judge Owens saying that the city immediately stopped using this particular device. Do very many law enforcement agencies use this device? I think it's a fairly newer device. I think it's, if you speak to some of the trainers out there, everyone is analyzing it. It has a certain purpose. What's the purpose of this as opposed to OC, which the city says, this is not OC. So that goes into the consumer expectation analysis, but it's for a particular purpose. It's for when you need to go hands-on or you want to subdue someone, but you don't want to go close up. I want to be further back, I want to subdue them, and then I want to go hands-on. As opposed to pulling out my Glock 21 and then subduing them and then they don't move. So it's got a spot in the hierarchy in law enforcement use. As far as how many agencies out there are using it, Your Honor, I apologize, I don't know that. So it was brought up by this panel that this isn't an aerosol, but Judge Fischer, you're absolutely right. As it travels through space, it opens, it dissipates. What happens at six inches is clearly different than what happens at five feet. And that's all the testing that PX on had, that they presented to Judge Perguson, and the court found not enough evidence to sustain the plaintiff's case. It's not a solid projectile. It's clearly not a solid projectile. It is a liquid. And a comment was made that the department was horrified to see that he could destroy an eyeball. There was not one witness who was deposed. In fact, it was the opposite who understood that if used improperly, if used within that five-foot range, death, serious injury, and the testimony shows blindness, could occur. Does the Court have any questions? Nothing further. I appreciate your time. You'll file something on the faculty, right? I will, Your Honor. Thank you. Thank you, Your Honors. Let me begin with the slide, the user manual reference that Paxson's counsel mentioned that would be provided to officers as part of the training. And here is exact wording from it. I apologize for reading, but it's essentially dispositive under McCabe and under the negligent misrepresentation theory. It is essentially dispositive. The face can be your primary target because the JPX does not use a projectile, thus there is no kinetic impact. You want to deploy the OC to the area with the greatest reaction, eyes, nasal passages, and mouth throat. They are training users that there is no kinetic impact, shoot them in the face, and those are simply false. And under McCabe, which is a California Court of Appeal case, essentially failing a safety risk representation in your own product literature is essentially per se an effective product under the consumer expectations test. Even though it's coupled with it shouldn't be used inside of five feet? I think we'll all agree that a warning was given it shouldn't be used inside of five feet. What they didn't say was if you use it inside of five feet, you're going to blow apart someone's eyeballs. Five feet is me to the edge of this podium. As I'm pulling this thing up and a person takes a step toward me, I go from this supposedly less lethal device to something that if I miss the nose and hit the eye or miss the side of the head and hit the temple, blasts apart their eyeballs and permanently blinds them. It's a less lethal device. I get the hey, a Glock's meant to kill someone, so what if it kills them a little harder? Okay, if that's your theory. That's not a less lethal device like this. You're aiming low. So delivering the projectile two to three times the published velocity, excruciating severe kinetic impact when you've told the officers in training there is no kinetic impact, is a defective product. And several of these, I mentioned McCabe, several of these are affirmative defenses, sophisticated intermediary, foreseeable misuse, and whether the benefit outweighs the inherent risk in the product are all affirmative defenses that a moving defendant has to definitively prove with their summary judgment, and they didn't do here. Thank you, counsel. Thank you, Your Honors. This matter is submitted. We appreciate argument from both counsel here today.
judges: Fisher, Owens, Molloy